Benjamin H. Price (TX 24060441)
Exall & Wood PLLC
3838 Oak Lawn Ave., Suite 1750
Dallas, Texas 75219
Telephone: (469) 619-6321
Facsimile: (469) 619-6511
bprice@exallwood.com

COUNSEL FOR U.S. MERCHANTS FINANCIAL
GROUP, INC.

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 7** |
| | § | |
| **Louis E. Martin, Jr.,** | § | **Case No.:  15-41103** |
| | § | |
| **Debtor.** | § | |

**OBJECTION TO DEBTOR'S EXEMPTIONS**

U.S. Merchants Financial Group, Inc. ("**Merchants**"), a creditor and party in interest herein, hereby files this *Objection to Debtor's Exemptions* (the "**Objection**").  In support of its Objection, Merchants respectfully states as follows:

**I.
PRELIMINARY STATEMENT**

1.      Merchants is a judgment creditor of Louis E. Martin, Jr. (the "**Debtor**"), holding a judgment in the principal amount of $271,679 (plus substantial accrued post-judgment interest).

2.      Merchants' judgment arises from a lawsuit that was originally filed against the Debtor on June 2, 2010.  On June 24, 2010, the Debtor purchased a 5,095 square foot house using nonexempt funds that were allegedly "loaned" to him by an entity he controlled.  He then set about making significant improvements to his new home, deliberately and hurriedly converting around

$600,000 of cash into an exempt homestead with the intent to hinder, delay, and/or defraud Merchants.

3.      The Debtor's maneuvering is precisely the type of conduct that Section 522(o) of the Bankruptcy Code was designed to prevent (and substantially the same type of conduct engaged in by the debtor in the *Thaw* case that was recently considered by this Court). *In re Thaw*, 496 B.R. 842 (Bankr. E.D. Tex. 2013). Accordingly, Merchants respectfully requests for the Court to limit the Debtor's claimed homestead exemption to $0 so that any equity in the homestead can be preserved for the Debtor's creditors.

## II.
## BACKGROUND

### A.      The Debtor Defrauds Merchants, Leading to the Synergy Judgment

4.      From at least August 2002 through March 2013, the Debtor and his business partner Chuck Clark formed, operated and were officers of 13 Florida companies. Each company operated from one of two common Florida addresses and shared common officers (sometimes the Debtor was the president and Clark was the vice president or secretary/treasurer; sometimes Clark was the president and the Debtor was the vice president) and registered agents (sometimes the Debtor and sometimes Clark). Ten of the companies were formed and administratively dissolved during the five-year time period from August 2002 to September 2007.

5.      Two of the now defunct companies were Synergy Design Group, Inc. ("**Synergy**"), and AOS, Inc. ("**AOS**"), a holding company that owned either a 50.0% or 66.7% interest in Synergy during 2003-2004. In late 2003, Synergy engaged in a one-time transaction by which it sold a large shipment of road flares to Sam's Club. Merchants provided a specific kind of packaging required by Sam's Club, and Sam's Club introduced Synergy to Merchants and instructed Synergy that it should use Merchants to provide packaging for the products that were

the subject of the Sam's Club transaction.  During the time period from September 17-22, 2003,

the Debtor personally discussed the terms of the transaction with Doug Farrell of Merchants

("**Farrell**"), specifically holding himself out as the "C.E.O." of Synergy on several occasions and

personally assuring Farrell that (i) the Debtor would personally oversee the relationship, (ii)

Synergy was financially strong and had sufficient revenue and assets on hand to pay the anticipated

charges at the time the parties entered into the relationship, (iii) Synergy would promptly pay

Merchants for the work and Merchants had nothing to worry about and (iv) Merchants had the

Debtor's "personal assurance" that the debt would be paid.

6.      By early January 2004, Merchants had provided all of the agreed services and, from

November 11, 2003 through January 5, 2004, Merchants issued 43 invoices to Synergy totaling

$278,452.  Of this amount, Synergy only remitted $6,773, leaving a remaining balance of $271,679

which was never paid.  On February 17, 2004, the Debtor, in his capacity as an authorized officer

of Synergy, made the following statement in an e-mail sent to an employee of Merchants in

response to Merchants' inquiry as to when the past due invoices would be paid:

> I apologize for the delay in payment.  I certainly understand your
> desire to collect what is owed as I feel the same way about all of our
> accounts.  I was expecting to receive full payment from Sam's Club
> by this time, but we have not yet received this.  As S.D.G. [Synergy
> Design Group] is a smaller company, we are unfortunately unable
> to make payment on these invoices until we receive income from
> Sam's Club. …Hopefully, we will be receiving final payment from
> Sam's in the next couple of weeks.  As soon as we do, all monies
> owed to U.S. Merchants will be paid in full.

7.      Upon information and belief, the foregoing email was sent for the sole purpose of

holding off Merchants' collection efforts while the Debtor and Clark siphoned all of the cash out

of Synergy.  This is clearly evident from the entries in Synergy's general ledger during this time

period, which show that:

i.  During the 34-day period immediately preceding the Debtor's sending of the above email, Synergy made significant cash deposits into its operating account totaling $864,051.95, including a $232,575.33 cash deposit noted as "sams payment" on January 15, 2004 and a $631,476.62 cash deposit from "Sales" on February 12, 2004.

ii. Between January 20, 2004 and February 12, 2004, according to Synergy's general ledger and check register, Synergy issued dividend payments and payments on shareholder liabilities totaling $454,912.35. Of that amount, $244,912.35 consisted of payments to AOS, and $180,000.00 consisted of a February 12, 2004 dividend payment directly to the Debtor. The Debtor's personal checking account records also reflect a deposit in the amount of $207,000.00 on February 23, 2014.

iii. Between February 17, 2004 (the date of the Debtor's fraudulent email to Merchants) and March 11, 2004, Synergy's made an additional cash deposit from sales into its operating account totaling $617,643.70 (on March 5) and issued an additional dividend check to the Debtor in the amount of $270,432.61.

iv. In total, from September 2003 through March 2004, Synergy made payments to its shareholders totaling at least $856,252, while leaving an unpaid balance to Merchants of $271,679. According to Synergy's financial records, the Debtor personally received at least $450,432 in distributions from Synergy over seven months from September 1, 2003 through March 31, 2004.

8.     On March 15, 2004, Merchants filed suit against Synergy in Los Angeles County, California Superior Court, alleging breach of contract and related claims arising from Synergy's failure to pay for the packaging services provided by Merchants. On August 16, 2004, the California court entered a default judgment in favor of Merchants and against Synergy for actual damages in the amount $271,679 plus $296.50 in costs (the "**Synergy Judgment**"). The Synergy Judgment remains wholly unsatisfied.

**B.     The Debtor Purchases a Home for $583,000 in Cash during the Same Month he is Personally Sued by Merchants**

9.     On June 2, 2010, Merchants filed a lawsuit against the Debtor in Los Angeles County, California Superior Court (the "**CA Alter Ego Lawsuit**"), seeking to have the Debtor

OBJECTION TO DEBTOR'S EXEMTPIONS – Page 4

held personally liable for the Synergy Judgment based on the fact that Synergy was, at all relevant times, the Debtor's alter ego.[1]

10.     Just three weeks later, on June 24, 2010, the Debtor purchased a 5,095 square foot home located at 4821 Normandy Drive in Frisco, Texas (the "**Normandy Property**"), for "$583,000 and some change." *See* Martin Depo at 14:21 – 15:9;[2] *see also* General Warranty Deed conveying the Normandy Property to the Debtor (attached hereto as **Exhibit D**).  The Debtor paid the $583,000-plus purchase price in cash.  *Id*. at 15:10 – 15:16.  After buying the Normandy Property, the Debtor immediately set about making substantial improvements to the property, including (i) the installation of travertine floors and new countertops and (ii) the installation of a new security gate.  *Id*. at 15:17 – 16:10.  Prior to moving into the Normandy Property, the Debtor rented a home located at 6417 Hampton Court in The Colony, TX, so no equity was rolled over from the Debtor's prior residence into the Normandy Property.  *Id*. at 54:11 – 55:5.

11.     The Debtor has not been able to keep his story straight when attempting to explain the source of the $583,000-plus of cash used to purchase and improve the Normandy Property. During prior sworn testimony, the Debtor testified that he received the necessary cash in the form of a "loan" from TotalFlare, Inc. ("**TotalFlare**") – another entity in the web of companies formed and then dissolved by the Debtor and Clark since the Debtor's initial involvement with Merchants. *Id*. at 116:15 – 116:23.  The Debtor also testified that (i) he pledged his stock in TotalFlare in order to secure that "loan" and (ii) his TotalFlare stock was foreclosed upon when he was unable to make

---

[1] A copy of Merchants' complaint in the CA Alter Ego Lawsuit is attached hereto as **Exhibit A**.  After the Los Angeles County Superior Court determined that it lacked personal jurisdiction over the Debtor, Merchants filed a substantially similar lawsuit in Dallas County District Court (the "**TX Alter Ego Lawsuit**").  A copy of Merchants' complaint in the TX Alter Ego Lawsuit is attached hereto as **Exhibit B**.

[2] Merchants took the Debtor's deposition in connection with Merchants' collection efforts following a judgment in its favor in the TX Alter Ego Lawsuit (the "**Martin Depo**").  Excerpts from the Martin Depo cited in this Objection are attached hereto as **Exhibit C**.

payments on that "loan." *Id*. at 168:1 – 169:21. This false testimony was exposed for the first time during the Debtor's 341 meeting in this bankruptcy case, when the Debtor testified that he sold $61,317 of TotalFlare stock in 2013.[3] At this stage, it is unclear where the cash came from that was used to purchase the Normandy Property. But such cash was clearly non-exempt.

**C.     Dallas County Court's Entry of a Fraud Judgment Against the Debtor**

12.     On March 26 and March 27, 2013, the TX Alter Ego Lawsuit was tried in Dallas County District Court. On April 11, 2013, the Dallas County District Court entered a final judgment in Merchants' favor and against the Debtor, personally, in the amount of $271,679 (plus $296.50 in costs and pre-judgment interest at the rate of 10% per annum on the amount of the judgment) (the "**TX Alter Ego Judgment**"). In its Findings of Fact and Conclusions of Law (attached hereto as **Exhibit E**), the Dallas County District Court found that, *inter alia*,

(i)     "Martin engaged in conduct constituting 'actual fraud'…i.e. conduct that was dishonest in purpose and intended to deceive – by at the outset of the relationship, making false and misleading statements to Merchants;"

(ii)     "Martin, acting in his capacity as an officer and stockholder of Synergy, misused Synergy's corporate fiction to defraud Merchants and evade a legitimate obligation for Martin's personal benefit;" and

(iii)     "Because Martin caused Synergy to be used for the purpose of perpetrating and did perpetrate an actual fraud on Merchants primarily for the direct personal benefit of Martin who, in 2004, personally received hundreds of thousands of dollars in cash distributions from Synergy that otherwise would have been available to pay Merchants debt, Merchants is entitled to pierce the corporate veil and hold Martin personally liable as a shareholder of Synergy for the principal amount of Merchants' unsatisfied judgment against Synergy plus accrued and unpaid post-judgment interest."

13.     The Debtor initiated an appeal of the Texas Alter Ego Judgment through the filing of a Notice of Appeal on July 8, 2013. On October 4, 2013, the Debtor filed an affidavit stating that he had a negative net worth (the "**Negative Net Worth Affidavit**" attached hereto as **Exhibit**

---

[3] This sale of stock is listed in Declaration # 2 in the Debtor's Statement of Financial Affairs [Docket No. 1].

**F**) in order to appeal the Texas Alter Ego Judgment without posting a bond. The Court of Appeals for the Fifth District of Texas denied the Debtor's appeal and affirmed the Texas Alter Ego Judgment on December 8, 2014.

### D.     The Debtor's Bankruptcy Filing

14.     The Debtor filed his bankruptcy case and bankruptcy schedules [Docket No. 1] (the "**Schedules**") on June 18, 2015 (the "**Petition Date**").

15.     In his Schedules, the Debtor alleges that his current residence located at 2340 Briar Court in Frisco, TX (the "**Briar Court Property**"), is exempt pursuant to the Constitution of the State of Texas and the Texas Property Code.   The Debtor alleges that the value of the Briar Court Property is subject to liens held by a Chuck Clark-owned company called "J.S.C.A., Inc." ("**JSCA**") and that the value of his claimed exemption on the Briar Court Property is $85,484.  As can be seen from the HUD-1 Settlement Statements for the Debtor's sale of the Normandy Property and Purchase of the Briar Court Property (attached hereto as **Exhibit G** and **Exhibit H**, respectively), the Debtor received $192,362.51 in cash when he sold the Normandy Property, and the entire $192,362.51 was used as a part of the purchase price of the Briar Court Property.

### III.
### OBJECTION

16.     Merchants objects to the Debtor's claimed homestead exemption in the amount of $85,484 and reserves its right to amend this Objection in the event that it is ultimately determined that the alleged liens held by JSCA that purportedly encumber the Debtor's homestead are determined to be invalid.  The Debtor disposed of nonexempt property (cash from the alleged TotalFlare "loan") and purchased a new homestead in the 10-year period preceding the Petition Date with the intent to hinder, delay, or defraud a creditor.  As such, the Debtor's claimed

homestead exemption should be reduced pursuant to the provisions of Section 522(o) of the

Bankruptcy Code.

### A.    Elements of 522(o)

17.    To prevail on an objection to a Debtor's exemptions pursuant to Section 522(o), a

movant must prove:

(i)    "the debtor disposed of property within 10 years preceding the bankruptcy filing;"

(ii)    "the property that the debtor disposed of was nonexempt;"

(iii)    "some of the proceeds from the sale of the nonexempt property were used to buy a new homestead, improve an existing homestead, or reduce the debt associated with an existing homestead…;" and

(iv)    "the debtor disposed of the nonexempt property with the intent to hinder, delay, or defraud a creditor."

*See, e.g., In re Presto*, 376 B.R. 554, 568 (Bankr. S.D. Tex. 2007); *In re Sissom*, 366 B.R. 677,

688 (Bankr. S.D. Tex. 2007).

18.    Elements (i)-(iii) above are readily apparent in this case.  Regardless of whether the

cash used to purchase the Normandy Property came from TotalFlare in the form of an actual loan

or the funds were simply pulled from that entity in complete disregard of its corporate status, the

Debtor disposed of nonexempt property in June 2010.  *See, e.g., In re Thaw* (holding that a debtor

that used funds held in the bank account of an entity he controlled to build an opulent dream home

disposed of nonexempt property within the meaning of 522(o)); *see also In re Fehmel,* 2008 WL

2151797 (Bankr. W.D. Tex. 2008) (holding that debtors disposed of non-exempt property within

the meaning of 522(o) when they used loan proceeds drawn from a line of credit held by a

corporation they controlled); *see also In re Keck*, 363 B.R. 193 (Bankr. D. Kan. 2007) (debtor that

used large cash advances from credit card companies to make improvements to his homestead and

eliminate secured debt on his homestead disposed of nonexempt property within the meaning of

section 522(o)).  And the Debtor has admitted that the purchase of the Normandy Property occurred

in 2010 (well within the 10-year lookback period) and was undertaken with the use of proceeds

from the alleged "loan" from TotalFlare.  The "equity" the Debtor claims in the Briar Court

Property is easily traceable to the fraudulent conversion of nonexempt assets when the Debtor

purchased the Normandy Property, as all of the "equity" the Debtor had in the Normandy Property

was rolled over into the Briar Court Property.  Finally, and as discussed below, the evidence

establishes element (iv) above, as it is beyond doubt that the Debtor purchased the Normandy

Property with the intent to hinder, delay and/or defraud Merchants.

**B.      "Badges of Fraud" Analysis**

19.     The fourth element of 522(o) – that "the debtor disposed of nonexempt property

with the intent to hinder, delay, or defraud a creditor" – may be established by direct or indirect

evidence.  *In re Cowin*, 2014 WL 1168714 *16 (Bankr. S.D. Tex. 2014) (citing *In re Presto* at 569

and *In re Sissom* at 692).  Because debtors that fraudulently convert nonexempt assets into their

homestead are rarely willing to admit they did so with the actual intent to hinder, delay, or defraud

a creditor, courts are typically required to engage in a "badges of fraud" analysis to determine if

the debtor's fraudulent intent can be inferred.  *See, e.g., In re Sissom* at 692; *In re Thaw* at 850

("Because direct evidence of a debtor's intent is usually unavailable, courts may infer actual intent

from circumstantial evidence.").

20.     Bankruptcy Courts in this Circuit have typically looked to the non-exclusive

"badges of fraud" listed in the Texas Uniform Fraudulent Transfer Act ("**TUFTA**") when

determining whether a debtor converted property with the intent of hindering, delaying or

defrauding a creditor for purposes of Section 522(o). *See, e.g., In re Thaw* at 851;[4] *see also In re*

*Sissom* at 692-693. The Fifth Circuit has noted that "[n]ot all, or even a majority, of the 'badges

of fraud' must exist to find actual fraud" and that "when several of these 'badges of fraud' are

present, a court may properly infer fraudulent intent." *In re Cowin* at \*17 (citations omitted). With

regard to the Debtor's purchase of the Normandy Property, almost all of the "badges of fraud" are

present and the overwhelming evidence supports the application of 522(o) to limit the Debtor's

homestead exemption:

> **i.      The transfer was to an insider, and the Debtor retained possession or
control of the property transferred after the transfer.**     The Debtor purchased the Normandy

Property and made improvements to the Normandy Property for his benefit, as he resided at the

Normandy Property for nearly four years after the transfer of the $583,000-plus for the purchase

price and improvements. Therefore, the first two "badges of fraud" listed in the TUFTA are

present. *See, e.g., In re Presto* at 570.

> **ii.     The transfer was concealed.**   As set forth above, the Debtor has been

unable to keep his story straight regarding the source of funds used to purchase and improve the

Normandy Property. He initially testified that the source of the funds was a "loan" from Total

Flare that was secured by a pledge of his stock, and that his stock was foreclosed upon when he

---

[4] The "badges of fraud" listed in the TUFTA include: (1) the transfer or obligation was to an insider; (2) the debtor retained possession or control of the property transferred after the transfer; (3) the transfer or obligation was concealed; (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) the transfer was of substantially all the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor. TEX. BUS. & COMM.CODE § 24.005(b). In addition to the foregoing non-exclusive statutory "badges of fraud," Courts in this Circuit have also considered the following indicia of fraud when conducting a 522(o) analysis: (i) "[t]he transfer was done just prior to the filing of the Debtor's bankruptcy petition;" (ii) "[t]he Debtor is unable to explain the disappearance of assets;" and (iii) "[t]he Debtor has engaged in a pattern of 'sharp dealing' prior to bankruptcy." *See, e.g., In re Sissom* at 692-693 (citations omitted).

did not make payments on the loan. *See* Martin Depo at 116:15 – 116:23; 168:1 – 169:21. He changed his story completely during his 341 meeting in this bankruptcy case, testifying that he sold $61,317 of TotalFlare stock in 2013. Beyond that, the Debtor has been unable to provide a HUD-1 Settlement Statement to Merchants related to the purchase of the Normandy Home, and claims to have no records showing the nature of the improvements that were undertaken by him before he moved in. The Debtor's concealment of the basic facts surrounding the TotalFlare "loan" and purchase and improvement of the Normandy Property indicate that he is actively trying to conceal material facts about this transaction.

iii.     **Before the transfer was made, the Debtor had been sued or threatened with suit.** As noted above, Merchants sued the Debtor in his individual capacity on June 2, 2010. The Debtor bought a 5,095 square foot home three weeks later and immediately set about putting money into the home for, *inter alia*, (i) the installation of travertine floors and new countertops and (ii) the installation of a new security gate. The Debtor's prior residence was rented, so there was no rollover of equity. The circumstances indicate that the Debtor's goal was to convert nonexempt funds into exempt funds due to the filing of Merchants' lawsuit.

iv.     **The transfer was of substantially all the Debtor's assets, and the Debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred**. As can be seen from the Negative Net Worth Affidavit, the Normandy Property was far and away the Debtor's most valuable asset as of the October 2013 – just over two years after the purchase and improvements to the Normandy Property were undertaken. The transfer of the $583,000-plus that was used to purchase and improve the home was unquestionably a transfer of a great majority of the Debtor's assets. And the Debtor's filing of a Negative Net Worth Affidavit indicates he was either insolvent at that time (or became insolvent shortly thereafter).

       **v.**       **The Debtor removed or concealed assets, cannot explain his loss of assets, and otherwise engaged in a general pattern of "sharp dealing"**.  To say that that the Debtor has engaged in a pattern of "sharp dealing" through removing and concealing assets would be an understatement.  For starters, the Texas Alter Ego Judgment recognizes that the Debtor (i) "engaged in conduct constituting 'actual fraud'…i.e. conduct that was dishonest in purpose and intended to deceive – by at the outset of the relationship, making false and misleading statements to Merchants," (ii) "misused Synergy's corporate fiction to defraud Merchants and evade a legitimate obligation for Martin's personal benefit" and (iii) "caused Synergy to be used for the purpose of perpetrating and did perpetrate an actual fraud on Merchants primarily for the direct personal benefit of Martin who, in 2004, personally received hundreds of thousands of dollars in cash distributions from Synergy that otherwise would have been available to pay Merchants debt."  Beyond that, and beyond the Debtor's misrepresentations to Merchants regarding the nature of the TotalFlare "loan" and stock pledge:

      i.    the Debtor has owned 16 vehicles during the last several years (including seven Mercedes, three Range Rovers, two Jaguars, and an Aston Martin), five of which were purchased in the five months after the entry of the Texas Alter Ego Judgment.  Yet he can't recall pertinent details about the purchase and sale of many of these vehicles (as evidenced by the Schedules).

      ii.    prior to the Petition Date, the Debtor regularly transferred personal funds into the bank account of SafeFlare Development, Inc., and used that bank account to make personal purchases (including some of the cars discussed above).  Yet the Debtor did not include the SafeFlare bank account when listing the property of his bankruptcy estate or pre-petition transfers.

      iii.    The Debtor is listed as a co-grantor on a deed that conveyed a condominium located in Linwood, New Jersey in July 2013.  Yet the Debtor claims he never received any consideration in connection with this sale and that his business partner Chuck Clark forged his signature on that deed.

       **vi.**       **The transfer occurred shortly before or shortly after a substantial debt was incurred.**  In the 3-year period following the Debtor's purchase of and improvements to the

Normandy Property, the Debtor allegedly incurred $450,000 in mortgage debt to JSCA (a company owned by Chuck Clark) and incurred judgment debt to Merchants through the Texas Alter Ego Judgment. There is no question that the Debtor incurred substantial debt in the timeframe immediately following his transfer of otherwise nonexempt property into the Normandy Property.

21.    When considering an objection to a homestead exemption pursuant to Section 522(o), "the simple question in the final analysis is whether Debtor is attempting to thwart his creditors rather than making an honest attempt to repay them." *In re Maronde*, 332 B.R. 593, 598 (Bankr. D. Minn. 2005) (citing *In re Mattson*, 241 B.R. 629, 637 (Bankr. D. Minn.1999)). In this instance, the evidence clearly points to a Debtor whose sole objective has been thwarting his primary creditor, with no intent of ever repaying that creditor's debt. As a result, the Debtor's homestead exemption should be limited to $0 pursuant to the provisions of Section 522(o) of the Bankruptcy Code.

**WHEREFORE**, Merchants respectfully requests for this Court to (i) sustain this Objection, (ii) grant the Chapter 7 Trustee an equitable lien on the Briar Court Property and permit the Chapter 7 Trustee to foreclose on such equitable lien and liquidate the Briar Court Property on behalf of the Debtor's creditors, and (iii) grant such other and further relief as may be just and proper.

Dated: September 3, 2015

Respectfully submitted,

**EXALL & WOOD PLLC**

*/s/ Benjamin H. Price*

Benjamin H. Price (TX 24060441)
Exall & Wood PLLC
3838 Oak Lawn Ave., Suite 1750
Dallas, Texas 75219
Telephone: (469) 619-6321

Facsimile: (469) 619-6511
bprice@exallwood.com

**COUNSEL FOR U.S. MERCHANTS FINANCIAL GROUP, INC.**

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that, on September 3, 2015, a true and correct copy of the foregoing document was served via this Court's PACER system.

*/s/ Benjamin H. Price*
Benjamin H. Price